Good morning. Thank you, Your Honors. Anthony Lonza for Plaintiff, Annette LeRoux and the Appellant as well. Well, from Appellant's perspective, Plaintiff's perspective, there's two ways that we can and should win this appeal, either one of which is good enough. The first way, of course, is if the asset in question never entered the bankruptcy because it was not listed on the bankruptcy schedules and because it didn't exist at the time the bankruptcy was filed and the schedules were filed. In that instance, of course, the claim belongs to Plaintiff and standing is not a problem. The other way in which we should win this appeal would be if at the back end of the bankruptcy, whatever was put in the bankruptcy in terms of this claim on the C.P.A. contract, in fact, was abandoned, as was the intent of the judge, as was the intent of the parties, the creditors, the debtors, and the trustee. If, in fact, those same assets exited the bankruptcy, then, of course, under that scenario as well, the standing is not a problem and we should prevail. In the end, as I'm sure you've seen, this is really a dispute among three judges, and two of those judges favor our posture, that being the bankruptcy judge in Florida, Judge Hyman, who not only originally abandoned all the assets but then later clarified that what he had done two years prior was, in fact, to abandon the entirety of the claim. And, of course, the other judge is the Florida State Court judge, Cynthia Cox, Judge Cox, who also granted the assignment to Ms. LeRoux on all of the claims against any defendants. And, of course, the judge which goes the other direction is Judge Selna, and that's why we're here. I do think this presents, this case presents a novel question of law. I don't, I think it's a question of first impression. We were not able to find another case where you had the intersection of the, of the O'Dowd line of cases at the front end of bankruptcy with the Batley line of cases at the rear end of the bankruptcy. That is the intersection here that we have not seen where, and at the beginning, O'Dowd is utilized to bring in claims that are sufficiently rooted in the bankruptcy past and thus impossible to sever, where that, where that, that same claim two years later, or three years later actually, is magically severed under the, under the Batley language, which explains that where claims are inextricably intertwined, nevertheless, some can stay in bankruptcy and some can exit at the end of the bankruptcy. I think that's a novel issue that needs to be addressed, and I, and I don't see how those lines of cases were ever meant to be compatible together. They cannot intersect because the O'Dowd line of cases requires that the asset be impossible to sever so that it goes in together, and then when you get to Batley, it's the opposite. We're talking about, well, quite frankly, at the end of the, at the end of the bankruptcy, if they're impossible to sever, then how can they be severed? The only way you would use Batley at the end of the bankruptcy is to sever them, despite the fact that they might be inextricably intertwined, according to that language. So I think that's an important thing to address in this appeal. I see I have, I want to reserve time, obviously, for rebuttal, but let me, let me do this. Let me ask you, do you have any questions of me at this time? You have 11 minutes and 40, it counts down, so you have 11 minutes left. Sounds good. I'd like to ensure that I reserve enough time for rebuttal, but I want to make sure right now to ask you, are there any questions of me? None here. Do you have any questions? What about the trial court position with regard to your second point that, look, by later on the bankruptcy court entering an amended order, Nunn-Protunk going back, that nonetheless he can't, that bankruptcy court can't affect the jurisdiction that the district court had at the time that the district court ruled, because at the time the district court ruled, the bankruptcy order that was later changed was in effect? Well, because Nunn-Protunk means now for then. It basically means now for then, thus what the judge is saying is here's what we did two years ago. It was not an amendment. It was not even relief pursuant to FRCP 60B. What that judge in Florida did is say, hey, you guys don't understand what I did. Let me clarify. Clarify means to illuminate, to explain, not to change. So that judge was telling all of us, including the judge in California, what I did two years ago was to abandon everything on the CPA contract out of the bankruptcy so that it could be pursued by the creditor, the 93 percent creditor, who is my client, Annette LaRue, who is the plaintiff here. So the answer is that. There was no change at all. It was merely a clarification. Well, what about the fact you went in to get the clarification without notice to opposing parties? We hired bankruptcy counsel in Florida who was told to instruct to give notice to everyone who was entitled to receive notice, and he did that to the trustee, to the court, to the entirety of the creditor matrix, which we were informed, and I'm not a bankruptcy lawyer, but we were informed by that lawyer that that was the entirety of notice that was required to reopen the bankruptcy case and to clarify that prior abandonment order. Well, bankruptcy is one thing, but since you're doing it in order to have impact on the district court case out here, then it would be a question about giving notice to the people out here, too, wouldn't it? I'm not aware of any requirement for the defendants in this case to receive a notice of a bankruptcy reopening and clarification order in Florida when they were not part of that bankruptcy. They were not creditors. They were not debtors. They were not interested parties. So, Your Honor, I appreciate the comment, Judge Pearsall, but I'm not aware of any requirement for such notification to do what we did in that bankruptcy court or what bankruptcy counsel did in that case. Well, given the fact that it was going to have impact out here, and that's why you were doing it, there would be, it would seem, a requirement for giving notice to the people here so that they could get there or in back there. Well, Judge Pearsall, I could better address the question if you could. Could you tell me what the source of that requirement for that notice might be? I don't usually answer questions. Okay. And I'll have to admit, I am just not aware of any such requirement for such notice, not only from our perspective as counsel in California, but in consulting with bankruptcy counsel in Florida. We have never been able to locate such authority or such a requirement, and, in fact, I don't believe I've seen it cited by opposing counsel either. I don't understand. I don't understand why these claims were not on, I guess, the husband's schedule, bankruptcy schedule, because he would have had them at the time, wouldn't he? Well, he listed, this is Mr. Ross, he listed the asset as the cause of action against CPA for the breach of contract, because at that time the only- But what about all the other people? Well, at that point in time- Cher, Rubino, Eastwood, CMGIA. At that point in time, we don't know if those people had engaged in false conduct, but we do know that Mr. Ross did not know what they were doing. He was only aware of the breach of contract that occurred in 2009 by the solitary defendant being CPA, because they'd breached the contract and that they were not paying him his monthly wages under that compensation agreement. So he listed the one claim of which he was aware. As against the other defendants, the cause of action had not yet accrued. Oh, he sold it to the company, to Eastwood, Rubino, and Cher, right? And those are three of the defendants who were running the company until it was dissolved who were involved in his not getting paid. Different contract. There's two contracts, stock purchase agreement and compensation agreement. You're referencing the stock purchase agreement, which is actually not the contract upon which we're suing. The contract in question is the compensation agreement, and that was with CPA. Yeah, but weren't- didn't Eastwood, Rubino, and Cher own CPA? They owned part of it. I believe they owned part of it, yes. But still, they weren't parties to the contract. The contract was with CPA and Mr. Ross for compensation for his ongoing role as a consultant. That was the contract that he claimed was breached. Now, what our claim is against the remaining defendants is separate from that. It's that they took the money from CPA and distributed it to themselves so as not to be able to pay that CPA debt to Mr. Ross, a fraudulent conveyance and a distribution of directors and shareholders in violation of California law. That didn't happen. That had not happened at the time of the bankruptcy filing. When the assets were scheduled for bankruptcy, that had not happened so the causes of action had not occurred. It happened the next year. The distributions were made, and the company was then dissolved. So that explains why when the bankruptcy schedules were filed, it was just a contract claim against CPA. Isn't there an ongoing duty to amend the schedules? I don't know, Your Honor. I'm not a bankruptcy lawyer. I don't know, and I don't know. Well, there is. There is an ongoing duty to amend the schedules and all the attachments. Well, it wouldn't be a duty for Ms. LaRue, I'm fairly sure. At that point, she wasn't even a trustee. No, it would have been for Mr. Ross. It was his bankruptcy, right? Yes, he was a debtor. He was a debtor in the bankruptcy. All right, okay. All right, you can reserve the rest of your time if you like. I'll do that. Thank you, Your Honor. I've got seven minutes of the 15 minutes. And who do you represent? And then Ms. Dodds has the remaining eight minutes. Who do you represent? My name is Robert Behrens. I represent Stephanie Shearer, Contractors Managing General Agency. I want to address three issues. One, that the causes of action against the non-CPA defendants came within the property of the estate pursuant to 541 of the Bankruptcy Code. Two, that those causes of action against the non-CPA defendants did not get abandoned pursuant to 554 of the Bankruptcy Code. And that three, if Ms. LaRue did not have title to the causes of action against the non-CPA defendants, when she filed her complaint, she did not have standing. And therefore, there's no case or controversy. And that was the basis for the District Court dismissing the action. The non-proton quarter that was issued in 2015 by the Bankruptcy Court could not retroactively cure that lack of standing. So starting with the first issue, property of the estate under 541 of the Bankruptcy Code section, we've cited the Supreme Court cases, Ninth Circuit cases, and it has two components, 541A1, which includes all legal or equitable interest of the debtor in property as of the commencement of the case, and A3, excuse me, A7, any interest in property that the estate acquires after the commencement of the case. The O'Dowd case references 541A7. The other important code section here is 1015, which defines claim. And claim is defined very broadly. It's a right to payment, but it includes even unliquidated, contingent, unmatured, and disputed rights to payment. So contingent, unmatured, they're included, and those claims are the basis for causes of action. The Ninth Circuit follows the Supreme Court case of Siegel versus Rochelle, which is a pre-Bankruptcy Code case from 1966. But what N. Ray Ryerson says, the Ninth Circuit case, by including all legal interests without exception, Congress indicated its intention to include all legally recognizable interests, although they may be contingent and not subject to possession until some future time. Then N. Ray Ryerson cited Siegel versus Rochelle, and it says the code follows Siegel insofar as it includes after acquired property sufficiently rooted in the pre-Bankruptcy past. And then it says, but eliminates the requirement that it not be entangled with the debtor's ability to start a fresh start. So in the Ninth Circuit, the Siegel sufficiently rooted in the pre-Bankruptcy past. Ms. Dodds is going to be talking specifically about the pre-petition activities, the things that happened prior to August 24th of 2010, and she will show how they are impossible to sever, which is the basis for the O'Dowd case. And the causes of action, some of them, and Ms. Dodds will go into this in more detail, but the breach of the compensation agreement pursuant to the Third Amendment complaint happened in April of 2009, which is pre-petition. So again, she'll go through chronologically all the things that happened pre-petition to show that these causes of action, the basis for these causes of action, and some of the causes of action had fully accrued pre-petition. So it's based on those two code sections, 541A and 1015, that the causes of action against the non-CPA defendants were included in the bankruptcy estate. So then the next question, were those causes of action abandoned? 554 of the code, as well as Bankruptcy Rule 6007, both require notice and a hearing. The code, the bankruptcy rules, are all established based on due process. They were put in there based on the Lane Supreme Court case, where before a party's rights are affected, they're entitled to notice and an opportunity for a hearing. That's what the district court held, that after looking at the motion to compel abandonment, the notice of abandonment, the order of abandonment, all those were in 2013. What the notice said, this is dated November 26, 2013, Robert Furr, the trustee of the bankruptcy herein, suing to 11 U.S.C. 544A, intends to abandon the following asset, a cause of action against CPA insurance company. What's not there is any claims or causes of action against the non-CPA defendants. So what the district court held was based on what happened in 2013, there was no abandonment of the causes of action against non-CPA defendants. So what happens then, well, let me go to the third issue and then tie that together with the order. Well, can I just ask you about what your opposing counsel said, that when he, when Ross filed the bankruptcy, that the claims against the other individuals had not yet arisen? That is really going to be explained more by Ms. Dodds. So I'm really going to leave those facts. I don't mean to not answer your question, but I'm trying to get through the legal issues. She's really going to get into those facts. Okay. There's quite a bit of activity that happened before August 24, 2010. The third issue is if LaRue did not have title, when she filed the cause of action, there was no case or controversy, there was no standing, and therefore the case had to be dismissed. The Florida state court order was January 2nd of 2014, immediately after the abandonment. And if you look at that, the thing that was stated in the Florida court order that assigns the cause of action to LaRue, it says includes any right of action or chosen action which Ross may have against CPA insurance company or others arising out of breaches of the agreements, referring to the compensation agreement and the stock purchase agreement. That's all they had to do, was they had to put in the abandonment back in 2013 the same language, but that wasn't done. So can you cure the lack of standing retroactively? And we've cited the case In Re Folks, 9th Circuit bankruptcy appellate panel case from 1997, and what the court held there is not even a non-proton abandonment order can retroactively cure CPS lack of standing. And that's exactly what's happened here. The In Re Folks case is direct to the point. Lack of standing, they didn't have it. When they filed the non-dischargeability action, they went back and got a non-proton order of abandonment, and then the bankruptcy appellate panel says you can't cure it retroactively. So those are the three issues I see. Is that seven minutes left in total? Yeah, I need to save that time for Ms. Dodds. All right, thank you, counsel. Thank you very much. May it please the Court, Deborah Dodds, Jacobs and Dodds, and I represent the remaining appellees. I think it's easier just to designate them in that way. Initially, I want to respond to something that appellant's counsel mentioned. He indicated that there was a dispute or that a dispute was created somehow between the judges and the judge in the district court when he granted the motion to dismiss, and that simply isn't true. Real briefly, an abandonment motion simply abandons the claim or the property to whoever owned it before the abandonment motion. The abandonment motion makes no determination about where the property goes or who gets it or what they're going to do with it. He simply abandoned the motion. When the assignment was made, the Florida court simply assigned the claims that Ross then owned. Now, when the district court reviewed those documents, he didn't change them or challenge them. He reviewed the actual language of the abandonment motions and the actual language of the assignment when he made his decision about motion to dismiss and standing. So there was no attempt by the district court to overturn anyone back east or to change any of their rulings. He interpreted those rulings as they existed. I'd also like to talk about the issue that the court has raised, and that is the inclusion of the causes of action. Now, the bankruptcy was filed in September of 2010, and at that time the debtor included the CPA claim in their schedule, in his schedules. And the court is right, the debtor has a continuing obligation to update the bankruptcy court with any property that it feels becomes part of the bankruptcy estate. Now, as my co-defendant's counsel indicated, property that comes into the estate comes in under 541, and it's very broad. And it includes actions that they were unaware of at the time that they filed that had not been filed prior to the bankruptcy and not scheduled. It essentially includes all potential causes of action that hypothetically could have been filed pre-petition. And as co-defendant's counsel acknowledged, it also includes claims that are sufficiently rooted in the debtor's pre-bankruptcy past. And according to O'Dowd, that are conceptually impossible to sever. So in this particular case, we have a group of contracts that were entered into in March of 2008. The stock purchase agreement closed in October of 2008. Plaintiff claims that CMGIA actually breached that stock purchase agreement in October of 2008. In November of 2008, CPA began paying Ross under the compensation agreement. Plaintiff alleges that there was a breach of the compensation agreement at that time because CPA Ross paid Ross less than he was allegedly due. It is CPA's position that Ross did nothing under the compensation agreement. And in January, CPA sent a letter to Ross telling him that he was in default. In April of 2009, CPA sent... That letter in the record? Yes. I think it's referenced, actually. The notice of breach is noticed in the complaint, but I believe that the letter is attached to, you know, I don't know where the termination letter is. It's referenced numerous times in the complaint. I know you're saying it's referenced in Ms. LaRue's complaint. Yes. Well, okay, but is there any evidence that Ross defaulted on that agreement? Well, the default is, I agree, the default is a matter of contention, and obviously if this case were to go to trial, that would be something that would be discussed at the time of trial. Obviously, LaRue feels that in some fashion the compensation agreement was not breached by Ross, and it is CPA's position that the compensation agreement was breached by Ross. That claim by LaRue that the compensation agreement was breached is actually the basis for this entire case. There's a factual dispute as to whether it actually happened, but it is the claim that is of import in regard to the inclusion in the bankruptcy. So as of April of 2009, LaRue claims that there was a breach of contract cause of action having to do with the compensation agreement, and that was based on CPA's termination of the compensation agreement. And by the way, we do not dispute that we sent the termination letter. So we have a termination. That occurred almost a year and a half prior to the filing of the complaint. There was also a mediation. Oh, my gosh. There was also a mediation. There's actually no dispute that the breach of contract cause of action went into the bankruptcy estate. Every other cause of action, well, let me put it this way, each and every subsequent cause of action in the Third Amendment complaint incorporates the breach of contract cause of action and is based on it. Even activities that occurred afterwards are still based on the compensation agreement and the breach of it. In essence, if you were to take that compensation agreement away, for example, if there was a determination that the compensation agreement was not breached, all of the other causes of action go away because the breach or the alleged breach of that forms the basis of all those causes of action. Because it is impossible to sever any of those other causes of action from the state. Okay. Well, I'm just thinking, so if, putting aside everything else, if Ross was in breach of the compensation agreement at the time he filed the bankruptcy, would that constitute a claim? I mean, he would be in breach. He wouldn't have a claim, would he? He's alleging, Leroux is alleging that Ross had a claim against CPA. That is the claim that is the subject of this case, is whether Ross has a claim against CPA for breach of the compensation agreement. Now, all of the other causes of action are just conceptually impossible to sever from that breach of contract cause of action. And if I can, in one second, for example, the fraudulent conveyance cause of action, for example, because that was cited by appellant's counsel. Yes, CPA did not distribute its funds until subsequent to the filing of the bankruptcy. CPA was not dissolved. But, for example, paragraph 73 of the complaint states that plaintiff was entitled to payment from defendants pursuant to the compensation agreement. Paragraph 76 talks about the debt that is the subject of that cause of action as the efforts, plaintiff's efforts to obtain payment for breaches of the compensation agreement. So all of these causes of action are based on the compensation agreement and become part and parcel of the bankruptcy estate. Okay. You're over your time, so you want to wrap up? Well, quickly, I guess. All of the causes of action became part of the bankruptcy estate. They were not taken out of the bankruptcy estate because there was no notice. And that's required. It's required under the bankruptcy code that notice be given. So they were never removed from the bankruptcy estate. When plaintiff tried to go back in 2015, he tried to obtain a non-protonc order. It was improper because it attempted to change or amend a prior order to add additional claims which adversely affected the substantive rights of people. So it was not, it was invalid, excuse me, an inappropriate non-protonc order. Also, that motion was filed more than the one-year statutory time limit in Rule 60B1, actually 60BC, for B1 motions. And as a result, the order itself was invalid because it was after the jurisdictional time limit. And as the court stated in its case, I mean, in its order, that the bankruptcy court in Florida doesn't have the authority or the right to issue an order to try to fix something that the plaintiff did wrong out here in the district court. Okay. Thank you, counsel. Thanks. Thank you, Your Honor. In terms of rebuttal, I'm going to identify, I'm just going to talk about four things that I heard there. First of all, Judge Wardlaw, you're obviously inquiring about the accrual of the cause of action. And let me be clear about this. The cause of action against CPA on breach of contract between Ross and CPA accrued in 2009 when the letter was sent that was a breach of the contract, which was manufactured by defendants in order to get the money out of the company and not have to pay Ross. As against all the remaining defendants, there was no accrual of the cause of action until 2011 at the earliest, because that's when the distribution happened. The distribution of the millions of dollars from CPA to the shareholders happened two years later after the filing of the bankruptcy in 2011. That's the earliest possible accrual. But it's probably later than that because there was a fraudulent conveyance going on here. By the nature of fraud, it was hidden from the plaintiff at the time, Ross, but really now by assignment, LaRue. So based on delayed discovery, you're probably even going to go later than 2011. Secondly, in terms of the apparent duty for Ross to have updated the schedules, it sounds like there is an agreement upon that. I'm going to assume that Ross wasn't yet aware that there was a claim against the other defendants beyond CPA because, again, the nature of fraudulent conveyance is the fraudulent effort to conceal the misconduct. Third, Ms. Dodds mentioned that the claims that went into bankruptcy were impossible to sever, and that's why they got into bankruptcy. That's a very important point with which we can agree in terms of looking at the back end of bankruptcy. If you are going to accept this position that the claims were impossible to sever, then here is the obvious question. How did they magically become severed at the end of the bankruptcy? It doesn't make sense. If she's right that they're impossible to sever, how is it at the end of the bankruptcy they get severed? Finally, in terms of the allegation of retroactive application here from the clarification order, again, the clarification order did nothing retroactively. It just explained what had, in fact, happened two years prior. And when you look at this, the dichotomy comes down to this. The case law on non-proton orders obviously validates them as long as they are not rewriting history. The case law is clear that a non-proton order is valid if its purpose is to speak the truth into the prior order. And the case law is also clear that if you're rewriting history, well, then it's not valid. That's the real dichotomy that we're arguing about here. And I would submit that what that bankruptcy judge did is he did not rewrite history. He simply went back and made sure the order spoke the truth. And to assume otherwise, we have to assume one of two things. We have to assume, if we're not going to, either one of two things. Either that bankruptcy judge didn't remember what he did two years prior, or we're going to assume that he's lying about what he did two years prior. But I think he deserves better. If we assume he knows what was in his head, and if we assume he's not lying to us, this question is answered. He was not rewriting history. He was ensuring that we understood what he tried to do two years earlier to ensure that the order spoke the truth. That's all I have, Your Honor. Thank you very much. All right. Thank you very much, Counsel. LaRue v. CPA Insurance Company is submitted, and we'll take up Ferreira v. Group
judges: Wardlaw, Gould, Piersol